UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
::
CHEMICAL OVERSEAS HOLDINGS, INC.,
CREDIT SUISSE FIRST BOSTON, BRIAN D.
O'NEILL AND DAVID MULFORD,

          Petitioners,  :  05 Civ. **6154**

    vs.  :  **ECF CASE**

REPUBLICA ORIENTAL DEL URUGUAY,
BANCO COMERCIAL S.A., AND
BANCO COMERCIAL S.A. FUND FOR
RECOVERY OF BANKING ASSETS,

          Respondents.  :
------------------------------------------------------------x

## DECLARATION OF LOUIS B. KIMMELMAN
## IN SUPPORT OF PETITION TO COMPEL ARBITRATION

   LOUIS B. KIMMELMAN declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

   1.  I am an attorney admitted to practice before this Court and a member of the firm O'Melveny & Myers LLP, counsel for Petitioners Chemical Overseas Holdings, Inc. ("Chemical") and Brian D. O'Neill ("O'Neill") in this proceeding.

   2.  I submit this declaration in support of the Petition to Compel Arbitration submitted by Petitioners Chemical, Credit Suisse First Boston ("CSFB"), Mr. O'Neill and David Mulford ("Mulford") (collectively, "Petitioners") pursuant to Section 206 of the Federal Arbitration Act, 9 U.S.C. § 206.

   3.  I am fully familiar with the facts set forth herein.

4.  Petitioners commenced this proceeding to compel arbitration as a result of Respondents' breach of the arbitration clause and covenant not to sue in the Subscription and Investor Rights Agreement, dated as of February 26, 2002 ("Agreement"). The Agreement contains a broad arbitration clause providing that any disagreement or dispute "arising out of or in connection with" the Agreement shall be resolved by arbitration and that "arbitration . . . is the exclusive method for resolving any Dispute." Respondents expressly undertook "not [to] commence an action or proceeding based on a Dispute." Notwithstanding these undertakings in the Agreement, Respondents commenced judicial proceedings. Petitioners therefore seek an order from this Court compelling Respondents to arbitrate in accordance with the Agreement.

## The Parties' Agreement

5.  In early 2002, Banco Comercial S.A. ("Banco Comercial") was the largest and oldest private commercial bank in Uruguay with sixty-six branches throughout the country. Chemical, CSFB and Dresdner Bank Lateinamerika AG (collectively, the "Shareholder Banks") were minority shareholders in Banco Comercial since 1990. O'Neill, Mulford and Holger Sommer (formerly an employee of Dresdner Bank Lateinamerika AG) (collectively, the "Individual Directors") served on the Board of Directors of Banco Comercial.

6.  In late January 2002, it was discovered that the local managers of Banco Comercial had perpetrated a fraud that threatened the bank's solvency.

7.  Respondent Republic of Uruguay (the "RoU") urged Chemical, CSFB and Dresdner Bank Lateinamerika AG to make new investments in Banco Comercial in order to help support the bank.

8. Negotiations ensued in New York, resulting in the execution of the Agreement by and between the RoU, the Shareholder Banks and Banco Comercial. A true and correct copy of the Agreement is attached to the Petition to Compel Arbitration as **Exhibit A**.

9. Pursuant to the Agreement, the Shareholder Banks agreed to make a further US$100 million investment in Banco Comercial subject to the RoU's promise to maintain Banco Comercial in sound financial condition and provide all necessary liquidity for the eleven-year term of the Agreement. Agreement §§ 2(a), 5(a) and 6(b)(i).

10. In accordance with the Agreement, the Shareholder Banks collectively invested US$100 million in Banco Comercial.

11. In the event that the RoU determined that it was unreasonable to continue providing financial support to Banco Comercial or if the RoU for any reason did not keep the bank in sound financial condition, the Shareholder Banks had the right to "put" (sell) their new investments in Banco Comercial to the RoU and the RoU was obligated to purchase those investments for the full amount of the investments made, totaling US$100 million. Agreement § 6(b)(ii).

**The Arbitration Clause**

12. The Agreement includes a broad arbitration clause providing for arbitration of all disputes "arising out of or in connection with" the Agreement under the Rules of Arbitration of the International Chamber of Commerce ("ICC") and provides that the arbitration will be conducted in New York, New York.

13. Section 11(b)(i) of the Agreement states:

> Any disagreement or dispute ("Dispute") between one or more Parties (the "Disputing Parties") arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the ICC (the "ICC Arbitration Rules").

## The Covenant Not to Sue

14. The Agreement includes an express covenant not to sue. Each party, including the RoU and Banco Comercial, expressly agreed that arbitration would be "the exclusive method for resolving any Dispute and further agree[d] that it will not commence an action or proceeding based on a Dispute" except in specific defined circumstances in aid of arbitration or if the arbitration clause is unenforceable. Agreement § 11(b)(i)(F).

## The Release

15. The Agreement includes a release that "irrevocably and unconditionally" releases and discharges the Shareholder Banks and the Individual Directors from any claims arising out of or relating to any action or inaction in respect of Banco Comercial or otherwise in connection with any investment in, or ownership of the capital stock of, or service as an officer or director of Banco Comercial, other than for intentional misconduct. Agreement § 10(a).

16. Section 10(a) of the Agreement states:

> <u>Release and Discharge</u>. Effective upon payment by the Investors [Shareholder Banks] of the Purchase Price on the Funding Date (i) the RoU, and (ii) the Issuer [Banco Comercial], on its own behalf, and on behalf of Afinidad AFAP, S.A. and Comercial Administradora de Fondos S.A., to the extent that such entities are controlled by it (and to the extent that such entities are not controlled by it, it will vote shares and cause directors directly or indirectly nominated by it to vote and otherwise in a manner consistent with these provisions), and its and their subsidiaries, and their respective officers, directors, agents and employees, in each case in such capacities and not in their individual capacities, predecessors, successors and assigns, **irrevocably and unconditionally releases and forever discharges (and the RoU will cause the Central Bank to release and forever discharge) each Investor [Shareholder Bank], and its respective Affiliates, officers, Investor [Shareholder Bank] Directors, agents, employees, predecessors, and successors (collectively, the "Investor Parties") from any and all Losses arising out of or related to any action or inaction, or alleged action or inaction, of any Investor Party prior to the date hereof in respect of the Issuer [Banco Comercial], Afinidad AFAP, S.A. or Comercial Administradora de Fondos S.A., any subsidiary thereof, otherwise in**

4

> connection with any investment in, or ownership of the capital stock of, or service as an officer or director of the Issuer [Banco Comercial], Afinidad AFAP, S.A. or Comercial Administradora de Fondos S.A., any subsidiary thereof, by any Investor Party, **except in respect of intentional misconduct by such Investor Party.**

Agreement § 10(a) (emphasis added).

17. The Agreement defines the "Losses" being released to include:

> any and all obligations, liabilities, demands, claims, costs, losses, actions and causes of action of whatever kind or nature, known or unknown, accrued or unaccrued, foreseen or unforeseen including any legal or other expenses reasonably incurred by it in investigating or defending any such loss, claim, liability, action or cause of action (collectively "Losses").... .

Agreement § 2(a)(vi).

18. The release has a number of important elements. First, the release is irrevocable and unconditional. Agreement § 10(a). Second, the release applies to the Shareholder Banks (and their affiliates) as well as to the Individual Directors, including Messrs. O'Neill and Mulford. *Id.* Third, the release applies to the whole range of "Losses" (as defined in the Agreement) arising out of or related to any action or inaction in respect of Banco Comercial or otherwise in connection with any investment in, or ownership of the capital stock of, or service as an officer or director of Banco Comercial. Agreement § 2(a)(vi). Fourth, the release applies to all conduct except "intentional misconduct." Agreement § 10(a).

## The RoU Breached the Agreement

19. The Shareholder Banks performed all their obligations under the Agreement, including their obligation to invest a total of US$100 million in Banco Comercial in reliance on the terms and conditions set forth in the Agreement. However, by late July 2002, the RoU had chosen to end its support for Banco Comercial by suspending the bank in August 2002 and then closing and commencing the liquidation of the bank in December 2002.

20. As a result, the Shareholder Banks exercised their contractual rights to sell their investments in Banco Comercial to the RoU for US$100 million. The RoU refused to purchase the Shareholder Banks' investments, in breach of its obligations under Section 6(b)(ii) of the Agreement.

### **Arbitration Before the ICC**

21. On January 31, 2003, the Shareholder Banks commenced an arbitration against the RoU before the International Court of Arbitration of the ICC pursuant to Section 11(b)(i) of the Agreement. The Shareholder Banks alleged that the RoU breached its contractual obligations under Section 6(b)(ii) of the Agreement when it refused to purchase the Shareholder Banks' investments in Banco Comercial as required by the Agreement. The RoU asserted various defenses to liability, including the defenses of lack of consideration, fraud in the inducement and unclean hands. However, the RoU never challenged the arbitration clause or its obligation to arbitrate all disputes arising out of or in connection with the Agreement.

22. Following a seven-day evidentiary hearing in New York, a three-member Arbitral Tribunal issued an unanimous final Award dated December 31, 2004 (the "Award") in favor of the Shareholder Banks. A true and correct copy of the Award is attached to the Petition to Compel Arbitration as **Exhibit B**.

23. The Arbitral Tribunal concluded that the RoU had breached its obligations under the Agreement and awarded the Shareholder Banks damages in the amount of US$100 million plus interest, attorneys fees and costs. Award at ¶¶ 62, 64, 66. In the Award, the Arbitral Tribunal noted the RoU's failure to address its alleged defenses of fraud in the inducement, lack of consideration and unclean hands during the arbitration and concluded that the RoU had abandoned those defenses. Award at ¶ 61.

## Enforcement of the Award

24.  Immediately after the Award was issued, the Shareholder Banks commenced proceedings to confirm and enforce the Award. On January 11, 2005, the Shareholder Banks filed a petition to confirm the Award in the United States District Court for the Southern District of New York.

25.  On March 25, 2005, the District Court (Lynch, G., U.S.D.J.) confirmed the Award in favor of the Shareholder Banks and against the RoU. A true and correct copy of the March 25, 2005 Opinion and Order is attached to the Petition to Compel Arbitration as **Exhibit C**.

26.  On May 10, 2005, the District Court denied the RoU's motion for reconsideration of its March 25, 2005 Opinion and Order. A true and correct copy of the May 10, 2005 Opinion and Order is attached to the Petition to Compel Arbitration as **Exhibit D**.

27.  Judgment was entered on June 3, 2005 pursuant to the District Court's opinions and orders. A copy of the June 3, 2005 judgment is attached to the Petition to Compel Arbitration as **Exhibit E.**

28.  The RoU never challenged the agreement to arbitrate during the judicial confirmation proceedings before this Court.

29.  To date, the RoU has not paid, nor has taken any steps to pay, the Award.

## Respondents File Judicial Proceedings

30.  Immediately following the issuance of the unanimous Award, the RoU began to threaten litigation against the Shareholder Banks and the Individual Directors and then commenced judicial proceedings against them, all in violation of the Agreement.

31.  On January 24, 2005 – only two weeks after the Shareholder Banks filed their petition to confirm the ICC Award against the RoU in the amount of over US$100 million in

damages – Respondents commenced a lawsuit against the Shareholder Banks and the Individual Directors by filing a Summons with Notice in the Supreme Court of the State of New York, New York County. A true and correct copy of the Summons with Notice is attached to the Petition to Compel Arbitration as **Exhibit F**.

32. The Notice alleges that the action is for (i) breach of fiduciary duty, (ii) fraud, (iii) corporate waste, (iv) intentional interference with prospective business relations, (v) conversion and (vi) an accounting. The relief sought is money damages of "not less than $700 million" together with interest from January 1, 1990 (the year that the Shareholder Banks became shareholders of Banco Comercial).

33. On February 24, 2005, the RoU filed a judicial demand before the Conciliation Court in Uruguay for a conciliation hearing with the Shareholder Banks as a first step to filing a lawsuit for damages of approximately US$1 billion arising from their alleged conduct with respect to Banco Comercial. A copy of the Demand for Conciliation is attached to the Petition to Compel Arbitration as **Exhibit G**. The conciliation hearing took place on May 5, 2005. At the hearing, the RoU asserted that it was seeking damages of approximately US$1 billion from the Shareholder Banks based on the conduct of the Shareholder Banks and their agents since 1990.

34. More recently, the RoU announced that it will file a lawsuit against the Shareholder Banks in Uruguay – in its "home court" – to recover damages allegedly suffered by the RoU and Banco Comercial. A copy of the May 25, 2005 *El Pais* article in which the government made this announcement is attached to the Petition to Compel Arbitration as **Exhibit H**.

## The Pending Arbitration

35. On June 30, 2005, the Shareholder Banks and the Individual Directors filed a Request for Arbitration with the International Court of Arbitration of the ICC. A copy of the Request for Arbitration (without exhibits) is attached to the Petition to Compel Arbitration as **Exhibit I**. In the Request for Arbitration, the Shareholder Banks and Individual Directors seek declaratory relief and damages based on Respondents' continuing breach of their contractual obligations under the Agreement, including their breach of the arbitration clause, the covenant not to sue and the release.

36. The Respondents named in the arbitration include the RoU, Banco Comercial and the Banco Comercial S.A. Fund for the Recovery of Banking Assets (the "Banco Comercial Fund").

37. The Banco Comercial Fund was established in connection with the liquidation of Banco Comercial. The Banco Comercial Fund consists of the assets and liabilities of Banco Comercial that existed on December 31, 2002, when the liquidation of Banco Comercial was initiated. The Banco Comercial Fund is not a legal entity separate from Banco Comercial.

38. Both Banco Comercial and the Banco Comercial Fund are under the control of the RoU.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 1, 2005, in New York, New York.

_____
Louis B. Kimmelman

NY1:1589496