UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
ORIENTAL REPUBLIC OF URUGUAY, et al.,      :

                              Plaintiffs,      :

                                          05 Civ. 6151 (WHP)
        -against-      :

CHEMICAL OVERSEAS HOLDINGS, INC., et al.,   :

                              Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
CHEMICAL OVERSEAS HOLDINGS, INC., et al.,   :

                              Petitioners,      :

                                          05 Civ. 6154 (WHP)
        -against-      :

REPUBLICA ORIENTAL DEL URUGUAY, et al.,    :

                              Respondents.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM AND ORDER

WILLIAM H. PAULEY III, District Judge:

        None of the parties in these two related actions believes that this Court is the appropriate forum in which to adjudicate their dispute. Four defendants in the first-filed action, No. 05 Civ. 6151 (WHP) (the "Fraud Action"), move to compel arbitration pursuant to section 206 of the Federal Arbitration Act ("FAA") and seek a stay. In the subsequently filed action, No. 05 Civ. 6154 (WHP) (the "Arbitration Action"), those same parties petition for an order compelling arbitration of Plaintiffs' claims in both the Fraud Action and a separate proceeding in Uruguay.[1] In turn, Plaintiffs – the Oriental Republic of Uruguay (the "RoU"), Banco Comercial

---

[1] In both actions, Chemical Overseas Holdings, Inc. ("Chemical"), Credit Suisse First Boston ("Credit Suisse"), David C. Mulford ("Mulford") and Brian D. O'Neill ("O'Neill") seek arbitration on behalf of themselves and Dresdner Bank Lateinamerika AG ("Dresdner") and Holger F. Sommer ("Sommer"), who are also defendants in the Fraud Action (collectively, "Defendants").

S.A. ("Banco Comercial") and Banco Comercial S.A. Fund for the Recovery of Banking Assets (the "Fund") – move to remand the Fraud Action to New York State court in the event that this Court denies Defendants' applications to compel arbitration.[2]

All three motions concern the intersection between the parties' obligation to arbitrate disputes "arising out of or in connection with" a written agreement, Plaintiffs' claims regarding events that pre-date the agreement, and the agreement's release provision that potentially disposes of Plaintiffs' claims. Defendants maintain that any dispute requiring construction of the release must be submitted to arbitration. Plaintiffs maintain that the release expressly excludes their claims and that there are no genuine disputes meriting arbitration. The two sides agree only that the agreement to arbitrate is valid and binding on them.

Given the broad language of the arbitration agreement, the parties' single point of concurrence requires that the very question of arbitrability be decided in arbitration and not by this Court. For the reasons that follow, this Court grants Defendants' motion and Petition to compel arbitration, grants Defendants' motion to stay the Fraud Action and denies Plaintiffs' motion to remand.

BACKGROUND

Until 2002, Banco Comercial was the oldest and largest private commercial bank in Uruguay. (Complaint, dated Dec. 9, 2005 ("Compl.") ¶ 9; Declaration of Louis B. Kimmelman, Esq., dated July 6, 2005 ("Kimmelman Decl.") ¶ 6.)[3] Chemical, Credit Suisse and Dresdner (together, the "Shareholders") were shareholders of Banco Comercial. (Compl. ¶¶ 10-

---

[2] While recognizing that they are also Respondents in the Arbitration Action, this Court refers to the RoU, Banco Comercial and the Fund as "Plaintiffs" for ease of reference.

[3] The parties' respective submissions in the Fraud Action are materially the same as their submissions in the Arbitration Action. Unless otherwise noted, citations to the record are to documents filed in the Fraud Action.

2

13; Kimmelman Decl. ¶ 6.)  Mulford, O'Neill and Sommer (collectively, the "Directors") were employees of the Shareholders who served on Banco Comercial's board of directors.  (Compl. ¶¶ 14-16; Kimmelman Decl. ¶ 6.)

In early 2002, Banco Comercial teetered on the verge of financial collapse, in part due to a series of allegedly sham transactions designed to camouflage massive investment losses in Argentina.  (Compl. ¶¶ 38-40; see Kimmelman Decl. ¶ 7.)  Uruguay's economy depended on Banco Comercial's continued solvency and the RoU feared a crippling run on the bank's assets. While Plaintiffs now claim that the Shareholders and the Directors are liable for failing to oversee management or impose internal controls (Compl. ¶¶ 45-49), the RoU approached those Shareholders for additional capital in 2002.  (Kimmelman Decl. ¶ 8.)

I.  The Agreement

On February 26, 2002, the Shareholders entered into a Subscription and Investor Rights Agreement (the "Agreement") with Banco Comercial and the RoU.  (Kimmelman Decl. Ex. A ("Agmt.").)  Each of the three Shareholders agreed to invest an additional $33,333,333 in Banco Comercial.  (Agmt. § 2(a)(i).)  In return, the RoU promised to maintain Banco Comercial in sound financial condition and provide all necessary liquidity for eleven years.  (Agmt. § 6(b)(i).)  In the event that the RoU determined that it was "unreasonable" to continue to sustain Banco Comercial, the Shareholders had the right to sell their new investments to the RoU for the return of their capital contribution.  (Agmt. § 6(b)(ii).)  The RoU and Banco Commercial also agreed to

3

> irrevocably and unconditionally release[] and forever discharge[] . . . each Investor, and its respective Affiliates, officers, Investor Directors, agents, employees, predecessors and successors (collectively, the "Investor Parties") from any and all Losses arising out of or related to any action or inaction, or alleged action or inaction, of any Investor Party prior to the date hereof in respect of [Banco Comercial] . . . except in respect of intentional misconduct by such Investor Party.

(the "Release").  (Agmt. § 10(a).)

The Agreement also contains a broad arbitration clause (the "Arbitration Clause") that provides that "[a]ny disagreement or dispute ("Dispute") between one or more Parties . . . arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the [International Chamber of Commerce ("ICC")]" by arbitration in New York. (Agmt. § 11(b)(i).)  Each party covenanted that arbitration will be "the exclusive method for resolving any Dispute and . . . that it will not commence an action or proceeding based on a Dispute" except in aid of arbitration or if the arbitration clause is adjudged unenforceable. (Agmt. § 11(b)(i)(F).)

II.  Disputes Over Obligations in the Agreement

Banco Comercial's financial condition continued to deteriorate even after it received the Shareholders' infusion of additional capital.  In August 2002, the RoU decided to cease Banco Comercial's operations, effective at year's end.  (Kimmelman Decl. ¶ 21.)  The Shareholders then sought to exercise their right to sell their supplemental investments but the RoU refused to purchase them.  (Kimmelman Decl. ¶ 22.)  In January 2003, the Shareholders commenced an arbitration proceeding in New York against the RoU claiming that it breached the Agreement.  (Kimmelman Decl. ¶ 23.)  The RoU did not protest the propriety of arbitration as a means to resolve that dispute.  On December 31, 2004, the ICC International Court of Arbitration ("ICA") issued an award in favor of the Shareholders for $100 million plus interest and costs.

4

(Kimmelman Decl. Ex. B.)  The award was confirmed in its entirety in a judicial proceeding in this District.  See Chemical Overseas Holdings, Inc. v. Republica Oriental Del Uruguay, 371 F. Supp. 2d 400 (S.D.N.Y. 2005), reconsideration denied, No. 05 Civ. 260 (GEL), 2005 WL 1123897 (S.D.N.Y. May 10, 2005).

III.  Disputes Over Matters Pre-Dating the Agreement

    A.  The Fraud Action

On January 24, 2005, Plaintiffs commenced the Fraud Action in New York State court by filing a Summons with Notice.  The Notice lists each of the Shareholders and Directors as defendants and represents that the action is for "(i) breach of fiduciary duty; (ii) fraud; (iii) corporate waste; (iv) intentional interference with prospective business relations; and (v) conversion" for conduct dating from January 1, 1990.  (Summons with Notice, dated Jan. 24, 2005.)  Defendants removed the Fraud Action to this Court on July 1, 2005, claiming federal question jurisdiction under sections 202 and 205 of the FAA, 9 U.S.C. §§ 202, 205.  Immediately upon removal, Defendants moved to compel arbitration and for a stay pending arbitration.

To avoid any expression of consent to federal jurisdiction, Plaintiffs resisted filing a complaint in the Fraud Action even after Defendants removed it to this Court.  (Transcript of Hearing on Dec. 1, 2005 ("Tr.") at 25-30.)  Instead, citing cases that permit removal from a New York State court based on a mere Summons with Notice,[4] Plaintiffs opted to rely on that document and a "Draft Complaint" submitted with Plaintiffs' opposition papers.  (Declaration of Ana C. Reyes, Esq., dated Sept. 7, 2005, Ex. 1.)  Because the Federal Rules do not recognize a

---

[4] See Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 204 (2d Cir. 2001) ("[A]lthough a summons with notice is not technically defined as a pleading under N.Y.C.P.L.R. § 3011, and the notice has no legal effect in New York except in cases of default, we nevertheless conclude that it may constitute an initial pleading for purposes of the federal removal statute."); accord U.S.E. Prods., Ltd. v. Marvel Enters., Inc., 314 F. Supp. 2d 213, 215 (S.D.N.Y. 2004).

"draft complaint" as a pleading, Defendants' applications to compel arbitration navigated in hypothesis and surmise. To dispel that uncertainty, this Court directed Plaintiffs to anchor their claims in a formal pleading without prejudice to their jurisdictional defenses. (Tr. at 29.)

Plaintiffs' Complaint, filed on December 9, 2005, alleges that the Fraud Action "arises from Defendants' intentional wrongdoing, including participating in, aiding and enabling a massive fraud that harmed Plaintiffs and the depositors of Banco Comercial S.A. . . . , intentionally abdicating their duties as directors and controlling shareholders of Banco Comercial and, inter alia, intentionally engaging in self-dealing transactions to their benefit and to the financial detriment of Banco Comercial." (Compl. ¶ 1.) Jettisoning some claims enumerated in the Summons with Notice and recasting others, the Complaint alleges claims for fraud, intentional breach of fiduciary duty, conversion and wrongful diversion of corporate assets. (Compl. ¶¶ 50-88.)

    B.  Litigation in Uruguay

On February 24, 2005, the RoU filed a judicial demand for a hearing with the Shareholders before the Conciliation Court in Uruguay (the "Uruguayan Conciliation Proceeding"). (Kimmelman Decl. Ex. G.) In that proceeding, the RoU seeks $1 billion in "damages arising from liability for the absence of controls and intentional misconduct in relation to the fraudulent scheme carried out at [Banco Comercial] . . . from October 1990 to February 2002." (Kimmelman Decl. Ex. G.) Plaintiffs aver that their Uruguayan claims are essentially the same as their claims in the Fraud Action. (Plaintiffs' Memorandum in Opposition to Motion to Compel Arbitration, dated Sept. 7, 2005 ("Pls. Mem.") at 8 n.4; Tr. at 32.)

    C.  <u>ICC Arbitration</u>

On June 30, 2005, Defendants filed a Request for Arbitration with Plaintiffs before the ICC. (Kimmelman Decl. Ex. I.) In that proceeding, Defendants allege that Plaintiffs breached the Agreement by filing the Fraud Action and commencing proceedings in Uruguay. (Kimmelman Decl. Ex. I.) After Plaintiffs objected that the dispute should not be arbitrated, the ICA ruled that the "arbitration shall proceed in accordance with Article 6(2) of the ICC Rules" – that is, with the arbitrators deciding questions of arbitrability. (Supplemental Declaration of Louis B. Kimmelman, Esq., dated Oct. 12, 2005 ("Supp. Kimmelman Decl.") Ex. N.)

    D.  <u>The Arbitration Action</u>

On July 1, 2005 – the same day they removed the Fraud Action to this Court – Defendants also commenced the Arbitration Action. With the Arbitration Action, Defendants seek to compel Plaintiffs to arbitrate the claims raised in the Fraud Action, the Uruguayan Conciliation Proceeding and any other proceeding Plaintiffs may have commenced in New York, Uruguay or elsewhere. Briefing on Defendants' Petition proceeded simultaneously with their motion in the Fraud Action and Plaintiffs' motion to remand.

DISCUSSION

Plaintiffs do not dispute that they entered a valid written agreement to arbitrate certain disputes. However, Plaintiffs contest whether the Arbitration Clause encompasses their claims. Defendants advance two arguments in response. First, they contend that the Arbitration Clause requires the question of arbitrability to be decided by an arbitrator. Second, they contend that Plaintiffs' claims in the Fraud Action and the Uruguayan Conciliation Proceeding must be

7

arbitrated because their viability necessitates construction of the Release, and because the Arbitration Clause applies to any dispute "arising out of or in connection with" the Agreement.[5]

I. Arbitration

When a party to a litigation raises the specter of arbitration, the parties' dispute over the merits temporarily yields to two threshold issues: (1) whether the claims should be resolved in arbitration; and (2) who should decide whether arbitration is the proper forum – a court or the arbitral tribunal itself. See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 942 (1995); see also Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) ("[P]rior to compelling arbitration, the district court must first determine . . . [whether] the parties' dispute falls within the scope of the arbitration agreement."); Sands Bros. & Co. v. Alba Perez Ttee Catalina Garcia Revocable Trust, No. 04 Civ. 0005 (JFK), 2004 WL 2186574, at *3 (S.D.N.Y. Sept. 28, 2004) ("The Court must first determine the threshold question of who decides whether the claim is arbitrable – the Court or the arbitrator.").

Defendants' motion and Petition to compel arbitration are governed by the FAA, which provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA implements the strong federal policy in favor of arbitration as an alternative means of dispute resolution. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985); Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001); In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237, 248 (S.D.N.Y. 2005).

---

[5] Although the Directors are not signatories to the Agreement, Defendants contend that Plaintiffs are estopped from avoiding arbitration with the Directors because of their agreement to arbitrate with the Shareholders. (Defendants' Memorandum in Support of Motion to Compel Arbitration, dated July 6, 2005, at 16 (citing JLM Indus. Inc. v. Stolt-Nielsen S.A., 387 F.3d 163, 178 (2d Cir. 2004); Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 98 (2d Cir. 1999).) Plaintiffs do not challenge this contention.

Whether an agreement to arbitrate encompasses a particular dispute is a matter of contract interpretation, to be determined in accord with applicable state law. Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002); see United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983); accord Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 294 (2d Cir. 1999). This presumption "applies with special force in the field of international commerce." Mitsubishi Motors, 473 U.S. at 631; accord Smoothline Ltd. v. N. Am. Foreign Trading Corp., 249 F.3d 147, 153 (2d Cir. 2001).

Parties may also agree to have questions of arbitrability resolved in arbitration. However, in contrast to merits-related disputes, the presumption is against an arbitrator deciding arbitrability and in favor of judicial resolution. Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002); First Options, 514 U.S. at 944-45; John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 53 (2d Cir. 2001) ("Issues of 'arbitrability' are presumptively for the court to decide, while issues others than 'arbitrability' are presumptively for the arbitrator." (internal quotations omitted)). Consistent with that presumption, "the issue of arbitrability may only be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." Bell, 293 F.3d at 566 (internal quotations omitted); see First Options, 514 U.S. at 944; AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986).

Such "clear and unmistakable evidence" may be found in the arbitration clause "even absent an express contractual commitment" of questions of arbitrability to an arbitral forum. Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003). For example, a broadly drafted arbitration clause may evidence the parties' intention to arbitrate the issue of arbitrability. See Shaw Group, 322 F.3d at 121; PaineWebber, Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir. 1996) ("The words 'any and all [disputes]' are elastic enough to encompass disputes over whether a claim . . . is within the scope of arbitration."); Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 46 (1997). Courts have also found clear and unmistakable evidence when the parties agree to be bound by the rules of an arbitrable tribunal that requires arbitrability to be decided in arbitration. See Contec Corp. v. Remote Solution Co., 398 F.3d 205, 211 (2d Cir. 2005) (rules of the American Arbitration Association); Shaw Group, 322 F.3d at 122 (ICC Rules); Bybyk, 81 F.3d at 1202 (National Association of Securities Dealers ("NASD") Code); see also Sacharow, 91 N.Y.2d at 46-47 (NASD Code). Thus, "parties may overcome the First Options presumption by entering into a separate agreement that (1) employs the 'any and all' language . . ., or (2) expressly incorporates the provisions of [a tribunal that requires questions of arbitrability to be decided in arbitration]." Wilson, 254 F.3d at 55.

Both factors are present here. First, the Arbitration Clause is a broad one. It requires arbitration of "[a]ny disagreement or dispute . . . arising out of or in connection with th[e] Agreement." (Agmt. § 11(b)(i).) Such broad language reflects the parties' intent to arbitrate all disputes relating to the Agreement – including whether the Arbitration Clause reaches a particular merits-related dispute. See Shaw Group, 322 F.3d at 121 (holding that a dispute over arbitrability is encompassed within an arbitration clause that covers "[a]ll disputes . . . concerning or arising out of" the agreement); see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 371 F. Supp. 2d 571, 575 (S.D.N.Y. 2005) ("An arbitration clause . . . does

10

not need to be unlimited in order sufficiently to evidence the parties' intent to arbitrate questions of arbitrability."). Whether the parties must arbitrate the implications of the Release for Plaintiffs' claims is undoubtedly a dispute that arises "in connection with th[e] Agreement." (Agmt. § 11(b)(i).) Accordingly, the Arbitration Clause reflects the parties' agreement to submit that question to arbitration.

Moreover, the Arbitration Clause requires that arbitration be conducted under the Rules of Arbitration of the ICC. In Shaw Group, the parties had agreed to conduct arbitration before "the [ICC] . . . in accordance with the rules and procedures of International Arbitration." 322 F.3d at 122. The Court of Appeals held that the incorporation of the ICC Rules sufficiently evidenced the parties' intent to arbitrate questions of arbitrability because "Article 6, section 2, of those rules . . . specifically provides for the ICA, the arbitral body of the ICC, to address questions of arbitrability, either sua sponte before an answer is filed or at the specific request of any party." Shaw Group, 322 F.3d at 122; see Rules of Arbitration of the International Chamber of Commerce Art. 6(2). So too here, as the ICA has already found (see Supp. Kimmelman Decl. Ex. N), the Agreement's express incorporation of the ICC Rules, together with the broad wording of the arbitration clause, provides clear and unmistakable evidence that the parties agreed to submit questions of arbitrability to arbitration.

Plaintiffs nevertheless contend that their claims lie beyond the scope of the Arbitration Clause because they pre-date the Agreement and because the Release carves out claims for "intentional misconduct." Thus, Plaintiffs protest, there is an "obvious answer" to the question of arbitrability and the issue need not be referred to arbitration. (Pls. Mem. at 14.) However, the answer is more nuanced than Plaintiffs maintain. Indeed, when parties have agreed that the scope of a release is to be resolved in arbitration, courts have ordered arbitration concerning the effect of the release on the plaintiff's claims before allowing those claims to

11

proceed in federal court. See Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano, 331 F. Supp. 2d 247, 257 (S.D.N.Y. 2004); Century Indemnity Co. v. Viacom Int'l, Inc., No. 02 Civ. 2779 (DC), 2003 WL 402792, at *5 (S.D.N.Y. Feb. 20, 2003).

> In any event, as instructed by the Supreme Court:
>
> [I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the [dispute] is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator.

AT & T Techs., 475 U.S. at 649-50; accord Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n, 965 F.2d 1224, 1233 (2d Cir. 1992) ("In deciding the contractual issue of arbitrability, courts must take pains not to rule on the merits of the underlying dispute."); Transit Mix Concrete Corp. v. Local Union No. 282, Int'l Bhd. of Teamsters, 809 F.2d 963, 967-68 (2d Cir. 1987); Stop & Shop Supermarket Co. v. United Food & Commercial Workers' Union Local 342, No. 05 Civ. 9606 (LBS), 2005 WL 3288132, at *4 (S.D.N.Y. Dec. 5, 2005).[6] This Court may not supplant the role of the arbitrator by anticipating the result likely to emerge from that process. Rather, as long as the Court is satisfied that the parties agreed to arbitrate a particular dispute – including a question of arbitrability, it must enforce the parties' agreement and submit the matter to arbitration. See ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 28 (2d Cir. 2002) (holding that a court must compel arbitration under section 206 of the FAA if the parties agreed to arbitrate and their arbitration agreement encompasses the asserted

---

[6] Plaintiffs rely on a passage in Woodcrest Nursing Home v. Local 144, 788 F.2d 894, 898 (2d Cir. 1986), in arguing that a court need not refer the question of arbitrability to arbitration if the Court can say "with positive assurance" that the parties did not agree to arbitrate the underlying dispute. In fact, the portion of the decision Plaintiffs cite reiterates the unremarkable proposition that a court need not submit a dispute to arbitration if the court determines that the parties did not agree to arbitrate that dispute. See Woodcrest, 788 F.2d at 898. As discussed above, the Arbitration Clause clearly and unmistakably reflects that the parties' agreed to refer questions of arbitrability to arbitration.

claims); Smith/Enron, 198 F.3d at 92 ("[A] district court's scope of inquiry in considering a petition to compel arbitration under Chapter Two of the FAA is very limited." (internal quotation omitted)).

Here, the threshold dispute requiring arbitration is not whether the Release bars Plaintiffs' claims, but whether that question is arbitrable. Because the Arbitration Clause provides clear and unmistakable evidence that the parties agreed to submit issues of arbitrability to an arbitral forum, this Court must enforce that agreement.

Accordingly, pursuant to section 206 of the FAA, this Court compels the parties to arbitrate the question whether Plaintiffs' claims in the Fraud Action and the Uruguayan Conciliation Proceeding – or at least the effect of the Release thereon, must be resolved in arbitration. Indeed, it will be for the arbitrators to determine the scope of arbitration.

II. Stay Pending Arbitration and Plaintiffs' Motion to Remand

Because the arbitrators might determine that there are no arbitrable issues or construe the Release in a manner that excludes Plaintiffs' claims, Plaintiffs might return to this Court to resume litigation of the Fraud Action. Therefore, judicial efficiency militates in favor of staying that action rather than dismissing it. See Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 316 (2d Cir. 1998) (recognizing a district court's authority to stay an action under Chapter 2 of the FAA "in light of the permissive language of Article VI of the Convention [on the Recognition and Enforcement of Foreign Arbitral Awards] and a district court's general discretion in managing its own caseload and suspense docket"); see also Energy Transp., Ltd. v. M.V. San Sebastian, 348 F. Supp. 2d 186, 201 (S.D.N.Y. 2004) (noting that section 3 of the FAA, which requires a Court to stay an action when arbitration is compelled under Chapter 1, "may be fully incorporated" into Chapter 2 of the FAA governing foreign arbitration agreements

13

and arbitral awards); <u>Satcom Int'l Group PLC v. Orbcomm Int'l Partners, L.P.</u>, 49 F. Supp. 2d 331, 337 n.4 (S.D.N.Y. 1999) ("[T]here was previously an open question as to whether the court that orders arbitration under the Convention must dismiss the action or may retain jurisdiction in aid of arbitration. Nonetheless, it now appears that the Court may retain jurisdiction and stay the action under its inherent power to control its docket." (citation omitted)). Moreover, re-ignition of the Fraud Action in the wake of arbitration could present additional issues that bear on this Court's jurisdiction.

Accordingly, this Court stays the Fraud Action pending arbitration and denies Plaintiffs' motion to remand as premature.

## CONCLUSION

For the foregoing reasons, Defendants' motion and Petition to compel arbitration are granted, and Plaintiffs' motion to remand is denied without prejudice. The Fraud Action is stayed pending arbitration. Accordingly, the Clerk of the Court is directed to transfer the action bearing docket number 05 Civ. 6151 (WHP) to this Court's suspense docket. Because this Memorandum and Order resolves all issues in the Arbitration Action, the Clerk of the Court is directed to close the action bearing docket number 05 Civ. 6154 (WHP).

Dated:  January 24, 2006
        New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

S. Robert Schrager, Esq.
Hodgson Russ, LLP
60 East 42nd Street
New York, NY  10165

Dane H. Butswinkas, Esq.
Paul B. Gaffney, Esq.
Ana C. Reyes, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005

*Co-Counsel for Plaintiffs/Respondents Oriental Republic of Uruguay,
Banco Commercial S.A. and Banco Central Del Uruguay
as Bankruptcy Trustee of Banco Commercial S.A.
Fund for the Recovery of Banking Assets*

(list of counsel continued on following page)

Louis B. Kimmelman, Esq.
Dana C. MacGrath, Esq.
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

*Counsel for Defendants/Petitioners Chemical
Overseas Holdings, Inc. and Brian D. O'Neill*


Henry Weisburg, Esq.
Tai Park, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022

*Counsel for Defendants/Petitioners Credit Suisse
First Boston and David Mulford*